### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **EDDYSTONE BOROUGH** : | |
| : | |
| **Plaintiff,** : | **Case No. 2:13-cv-01470-PBT** |
| : | |
| **v.** : | |
| : | |
| **PETER V. PIROZZI GENERAL** : | |
| **CONTRACTING, LLC,** : | |
| **and** : | |
| **UNITED STATES SURETY COMPANY** : | |
| **INC.,** : | |
| **and** : | |
| **HCC SURETY GROUP, INC.** : | |
| : | |
| **Defendants.** : | |
| : | |
| **PETER V. PIROZZI GENERAL** : | |
| **CONTRACTING, LLC** : | |
| : | |
| **Third Party Plaintiff,** : | |
| : | |
| **v.** : | |
| : | |
| **CATANIA ENGINEERING** : | |
| **ASSOCIATES, INC.,** : | |
| : | |
| **Third Party Defendant.** : | |

### <u>MEMORANDUM OPINION</u>

**Tucker, C.J.**                                                                           **April 6, 2015**

      Presently before the Court is Defendants United States Surety Company ("USSC") and

HCC Surety Group, Inc.'s (collectively "the Sureties") Motion for Summary Judgment (Doc.

44), Defendants USSC and HCC Surety Group's Informative Motion Regarding Docket No. 44

(Doc. 45), Plaintiff Eddystone Borough's ("the Borough") Brief in Opposition to Defendants

USSC and HCC Surety Group's Motion for Summary Judgment (Doc. 48), Defendants USSC

and HCC Surety Group's Brief in Support of their Motion for Summary Judgment (Doc. 53),
Defendant/Counter-Plaintiff Peter V. Pirozzi General Contracting LLC's ("PVPGC") Motion for
Partial Summary Judgment (Doc. 46), Plaintiff/Counter Defendant Borough's Brief in
Opposition to PVPGC's Motion for Partial Summary Judgment (Doc. 51), and
Defendant/Counter-Plaintiff PVPGC's Reply Brief in Support of Its Motion For Partial
Summary Judgment (Doc. 54).[1]

The Borough filed its Complaint against PVPGC, USSC, and HCC Surety Group
bringing a breach of contract action against PVPGC and an action on bond against USSC and
HCC Surety Group after PVPGC allegedly breached its construction contract with the Borough.
Defendant USSC had issued a performance bond as the Surety and named the Borough as the
Owner and PVPGC as the Contractor. PVPGC counterclaimed against the Borough claiming 1)
violations of the Pennsylvania Prompt Payment Act, 62 PA. CONS. STAT. ANN. § 3901, et seq.
and 2) breach of contract. PVPGC now moves for partial summary judgment on its breach of
contract counterclaim against the Borough.[2] (See PVPGC's Mot. for Partial Summ. J. at 3)

---

[1] On April 10, 2013, PVPGC filed its Third Party Complaint against Catania Engineering Associates
("CEA") alleging negligent misrepresentation and tortious interference. (Doc. 11.) On December 12,
2014, Third Party Defendant CEA filed a Response in Opposition to Defendants USSC and HCC Surety
Group's Motion for Summary Judgment (Doc. 50.) incorporating the Borough's Response and Brief in
Opposition to USSC and HCC Surety Group's Motion for Summary Judgment. Because CEA does not
assert any cause of action against the Sureties and is not a party to the Borough v. PVPGC, et al. action,
the Court declines to consider CEA's Response in Opposition.

[2] The Court recognizes some ambiguity in PVPGC's Motion for Partial Summary Judgment as to
precisely which claims PVPGC's Motion refers. In one instance, PVPGC avers, "The subject of the
instant motion relates to PVPGC **Claims** for relief against the Borough . . ." (PVPGC's Mot. for Partial
Summ. J. at 3 (emphasis added)). In the "Factual Background" section of its Motion, PVPGC references
the Pennsylvania Prompt Payment Act and offers factual details related to its Prompt Payment Act
counterclaim against the Borough. (Id. at 12-13.) Still, the "Argument" section of PVPGC's Motion never
revisits this discussion of the Prompt Payment Act, and focuses on the Borough's alleged breach of
contract. Even more confusing, PVPGC concludes its Motion and Brief requesting that the Court grant
PVPGC summary judgment "on the issue of liability." (Id. at 25.) Because the substance of PVPGC's
Motion focuses on its breach of contract counterclaim against the Borough and PVPGC plainly states that
its Motion is limited to its "claims for relief against the Borough," the Court will limit its analysis of

Defendants USSC and HCC Surety Group move for summary judgment in their favor claiming that they are not liable under the performance bond because the Borough failed to satisfy the express conditions precedent set forth in the performance bond and the Borough committed an Owner Default. The Court will address PVPGC's Motion for Partial Summary Judgment as it relates to PVPGC's breach of contract counterclaim and the Sureties' Summary Judgment Motion.

For the following reasons, the Court will ***grant*** Counter Plaintiff PVPGC's Motion for Partial Summary Judgment and ***grant*** Defendants USSC and HCC Surety Group's Motion for Summary Judgment.

## FACTUAL BACKGROUND[3]

---

PVPGC's Motion for Partial Summary Judgment to PVPGC's breach of contract counterclaim. (PVPGC's Mot. for Partial Summ. J. at 3.)

[3] The Sureties' Motion sets forth factual statements supported by citations to materials in the record pursuant to Federal Rule of Civil Procedure 56(c)(1)(A). Federal Rule of Civil Procedure 56 imposes a requirement upon a party to address the supported factual assertions made by another party. See FED. R. CIV. P. 56(c)(1); accord FED. R. CIV. P. 56(e) (giving the court discretion to consider facts as undisputed "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)"). Rule 56(c)(1) provides, in pertinent part, that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to **particular parts of materials in the record**," or "showing that the materials cited do not establish the absence or presence of a genuine dispute." (emphasis added).

When a party fails to properly address another party's factual assertion, the court may:

> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials--
> including the facts considered undisputed--show that the movant is
> entitled to it; or
> (4) issue any other appropriate order.

FED. R. CIV. P. 56(e). Here, The Borough's Brief in Opposition to the Sureties' Motion inconsistently cites to the record or, at times, fails to address the Sureties' factual assertions.

The Court also notes that the "Facts" sections in both PVPGC's Motion for Partial Summary Judgment and the Borough's Brief in Opposition to PVPGC's Motion suffer from the same deficiencies and at times, sets forth "conclusory allegations or mere suspicions" rather than factual assertions. Byrne v. Chester Cnty. Hosp., No. 09-8892012 WL 4108886, at *2 (E.D. Pa. Sept. 19, 2012).

Pursuant to FED. R. CIV. P. 56(c)(3), "[t]he court need consider **only** the cited materials, but it may consider other materials in the record." (emphasis added). The Court has reviewed the materials in

Plaintiff Borough is a political subdivision of the Commonwealth of Pennsylvania located in Delaware County. (Compl. ¶ 1) The Borough authorized the construction of a new Eddystone Firehouse and Evacuation Center (the "Project") in 2011. (Borough's Br. in Opp'n 2, Doc. 48) The Project was financed through a low-interest loan from the Delaware Valley Regional Finance Authority ("DVRFA"). The Borough's engineer, Catania Engineering Associates ("CEA"), drafted the architectural plans, solicited public bids, and served as construction manager for the Project. (Id.) The Project had four prime construction contractors for general construction, plumbing, electrical, and mechanical work. (Id.)

The Borough solicited public bids for the four prime contracts on the Project in July 2011. The Borough awarded the General Construction contract to PVPGC on PVPGC's August 15, 2011 bid of $1,944,000. (See id. at Exs. B and C) The Borough and PVPGC entered into a General Construction Contract ("GCC") on September 12, 2011, which provided that the Project completion date was 270 consecutive calendar days from the date of the Notice to Proceed. (See id. at Ex. C, Art. 39) The Notice to Proceed was issued on October 3, 2011 with an effective date of October 4, 2011. (Id. at Ex. F) Accordingly, the effective Project completion date was June 30, 2012.

Article 28 of the General Conditions of the GCC describes the process for annulment:

The Bidders to whom the Contract is awarded must begin actual work on the ground within 10 days from the date of executing the Contract, or obtain from the Owner an extension of time. If the Contractor . . . . from any other causes whatsoever shall not carry on the work in an acceptable manner, the Owner may **give notice in writing to the Contractor and his Surety**, **of such delay, neglect or default**, specifying the same and **if the Contractor, within a period of 3 days after such notice, shall not proceed in accordance therewith**, **then the Owner shall have full power and authority**, without violating the Contract, **to take the prosecution of the work out of the hands of the Contractor**, to appropriate or

_____

the record and will consider the record in its entirety for the purpose of rendering an Opinion in this action.

use of any or all materials and equipment on the ground that may be suitable and acceptable, to enter into an agreement, without advertising for bids thereof, for the completion of said contract according to the terms and provisions thereof, or to use such other methods as in its opinion shall be required for the completion of said contract in an acceptable manner. . . .

(USSC/HCC Mot. for Summ. J. Ex. T, Art. 28 (emphasis added); Borough's Br. in Opp'n Ex. C, Doc. 48 (emphasis added)). Additionally, Paragraph 3 of the GCC states:

Should the Contractor at any time . . . fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of any of the agreements herein contained, such refusal, neglect or failure being certified by the Engineer, **the Owner shall be at liberty after 3 days written notice to the Contractor** to provide any such labor or materials and to deduct the cost thereof from any monies then due or thereafter to become due to the Contractor under this Contract, and if the Engineer shall certify that such refusal, neglect or failure is sufficient ground for such action, **the Owner shall also be at liberty to terminate the employment of the Contractor for the said work and either call upon the Surety to complete said Contract or to enter upon the premises and take possession for the purpose of completing the work included under this Contract** . . . .

(USSC/HCC Mot. for Summ. J. Ex. K (emphasis added); Borough's Br. in Opp'n Ex. C, at CEA1785, Doc. 51 (emphasis added).)

Also on September 12, 2011, PVPGC and USSC executed a performance bond—a form copy of which CEA, on behalf of the Borough, provided PVPGC—in the same amount of the GCC, $1,944,000. (Id. at Ex. D; see also PVPGC's Mot. for Partial Summ. J. 8; id. at Ex. Y; USSC/HCC's Mot. for Summ. J. Ex. G.) USSC is a wholly owned subsidiary of HCC Surety Group. (Compl. ¶ 5) The performance bond ("EB Bond") named the Borough as the Owner, PVPGC as the Contractor/Principal, and USSC as the Surety. (See USSC/HCC's Mot. for Summ. J. Ex. G.)

The language in the EB Bond is almost identical to that in other standard performance bonds such as the American Institute of Architects Form A312-Performance Bond-1984 ("A312 Bond") and the EJCDC No. 1910-28-A (1996 Edition) ("EJCDC Bond"). (Id. at ¶ 12; compare

id. at Ex. G with id. at Exs. H and I.) As with the A312 Bond and the EJCDC Bond, the EB Bond

defines an "Owner Default" at paragraph 12.4: "Failure of the Owner, which has neither been

remedied nor waived, to pay the CONTRACTOR as required by the Contract or to perform and

complete or comply with the other terms thereof." (Id. at Exs. G, H, and I ¶ 12.4.)

     The EB Bond and the EJCDC Bond use identical language when discussing the Surety's

obligations under the bond where there is **no** Owner Default:

> 3. If there is no OWNER Default, the Surety's obligation under this Bond shall arise after:
>
> > 3.1   The OWNER has notified the CONTRACTOR **and** the Surety **at the address described in paragraph 10 below**, that the OWNER is **considering declaring a CONTRACTOR Default** and has requested and attempted to arrange a conference with the CONTRACTOR and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Contract. If the OWNER, the CONTRACTOR, and the Surety agree, the CONTRACTOR shall be allowed a reasonable time to perform the Contract, but such an agreement shall not waive the OWNER's right, if any, subsequently to declare a CONTRACTOR Default; and
> >
> > 3.2   The OWNER has declared a CONTRACTOR Default and formally terminated the CONTRACTOR's right to complete the CONTRACT. Such CONTRACTOR Default **shall not be declared earlier than twenty days after the CONTRACTOR and the Surety have received notice as provided in paragraph 3.1**; and
> >
> > 3.3 The OWNER has agreed to pay the Balance of the Contract Price to:
> >
> > > 3.3.1 The Surety in accordance with the terms of the Contract;
> > >
> > > 3.3.2 Another contractor selected pursuant to paragraph 4.3 to perform the Contract.

(Id. at Exs. G. and I ¶ 3 (emphasis added).)

     The language in the A312 Bond varies slightly, indicating that when there is no Owner

Default, the Surety's obligations under the A312 Bond arises after:

3.1     The OWNER has notified the Contractor **and the Surety at the address described in Paragraph 10 below** that the Owner is **considering declaring a Contractor Default** and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2     The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default **shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Sub-paragraph 3.1**; and

3.3     The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

(Id. at Ex. H ¶ 3 (emphasis added).)

Paragraph 10 of the EB Bond, the EJCDC Bond, and the A312 Bond specifies the correct address where notice should be sent: "Notice to the Surety, the OWNER or the CONTRACTOR shall be mailed or delivered to the address shown on the signature page." (Id. at Exs. G, H, and I ¶ 10.) The signature page of the EB Bond—also the first page of the EB Bond—identified USSC's address as 20 W. Aylesbury Road, Timonium, Maryland 21094. (Id. at Ex. G.) The signature page was signed by Peter V. Pirozzi, the Managing Member of PVPGC, and Gemma B. Fendler, USSC's attorney-in-fact. (Id.) Ms. Fendler was a bond manager at Moten Associates, Inc., which was an independently-owned broker engaged in the securing of surety bonds and commercial insurance. (Id. at ¶¶ 28-29.) Ms. Fendler worked at Moten Associates from June 1998 to April 2012 when she left to form her own company. (See id. at ¶ 47; Fendler Dep. 12:7-22, 13:4-19, 21:1-3, Apr. 30, 2014.)

7

The Borough alleges that PVPGC failed to promptly begin working on the Project after the Borough had issued its Notice to Proceed in October 2014. (Compl. ¶ 10.) PVPGC blames CEA for various design deficiencies and improper contract administration services, which PVPGC claims adversely affected its ability to perform work on the Project. (Countercl. ¶¶ 16-56.)

CEA's Project Manager, Louis D. Brown, issued a letter to PVPGC on November 7, 2011 responding to PVPGC's request for payment and also expressing concerns about PVPGC's progress on the Project. (See USSC/HCC's Mot. for Summ. J. Ex. P.) Mr. Brown mailed this letter to Gemma Fendler at two addresses: 1) Moten Associates located in Norristown, Pennsylvania, and 2) USSC located in Timonium, Maryland. (See id.) Upon receipt of and in response to Mr. Brown's letter, Emily Brennan, a Senior Claims Attorney at USSC, issued a letter by facsimile and regular mail, directing Mr. Brown on November 18, 2011, to send "all future correspondence relating to this matter to my attention at the address listed on this letterhead or via email to ebrennan@hccsurety.com." (Id. at Ex. R.) The address on the letterhead was the same Timonium, Maryland address for USSC listed on the signature page of the EB Bond: 20 W. Aylesbury Road, Timonium, Maryland 21093.

Mr. Pirozzi requested a 90-day extension of the Project completion date on March 26, 2012. (Borough's Br. in Opp'n Ex. I, Doc. 48.) On June 28, 2012, the Borough granted PVPGC a 19-day extension until July 19, 2012 to account for weather-related delays and sewer outfall removal. (Id. at Ex. M.) Later, on July 10, 2012, Mr. Brown, on behalf of the Borough, issued another letter to PVPGC extending the Project completion date to August 15, 2012 conditioned on Mr. Pirozzi's written acknowledgment that PVPGC would meet the new deadline. (Id. at Ex. N.) Mr. Pirozzi did not return the written acknowledgment.

On July 20, 2012, Mr. Brown sent another letter to Mr. Pirozzi stating:

> Please be advised the Time for Completion has expired as of July 20, 2012, as based on a letter dated June 28, 2012. Despite several attempts, we still have not received a revised schedule for completion.
>
> Be advised that Borough Council reserves their rights of [sic] under the General Conditions of the contract, including but not limited to Article 26, Article 28 and Article 40.

(USSC/HCC's Mot. for Summ. J. Ex. W.) Mr. Brown did not copy USSC or HCC Surety Group on this letter. Mr. Brown testified that this was not a termination letter; he was simply informing PVPGC that their time to complete the Project had expired. (See Brown Dep. 293:2-6, May 8, 2014.)

On July 24, 2012, CEA's President, Charles J. Catania, sent a letter to Ms. Fendler at USSC at the Timonium, Maryland address stating:

> Please be advised that Eddystone Borough is exercising its rights under the agreement to terminate the contract with Peter V. Pirozzi Contracting, LLC. It is the Borough's intent to contract with reputable contractors to finish the project.
>
> The time for completion was June 30, 2012, the time was extended to July 19, 2012 due to weather and an unforeseen condition on the site. Progress has continued to be unsatisfactory and to date we have not received a competition [sic] schedule despite several requests. . . .

(USSC/HCC Informative Mot. Ex. X.) Mr. Catania also sent this letter to the attention of Andrea Engler, a bonds claims assistant with the Sureties. (See id.) Mr. Catania did not copy Mr. Pirozzi or anyone from PVPGC to this letter. (See id.) On August 13, 2012, USSC issued a letter to CEA formally denying the Borough's claim on the EB Bond and outlining its reasons for doing so. (USSC/HCC Mot. for Summ. J. Ex. BB.)

On August 26, 2012, Mr. Catania called the local police department to remove PVPGC's workers and representatives from the Project site. (Compl. ¶ 31; Countercl. ¶ 80-81.) PVPGC claims that its workers left behind tools and equipment worth more than $52,000 at the Project site. (Countercl ¶ 81.) To complete the Project, the Borough hired some of PVPGC's sub-

contractors. (Compl. ¶ 33.) The Borough alleges that PVPGC received $1,473,174.50 in payment for the Project and that the Borough was required to expend $558,030.11 in excess of the original contract price to complete the Project. (Id. at ¶¶ 35, 38.) PVPGC claims that it suffered actual damages in an amount greater than $325,000. (Countercl. ¶ 100.)

The Borough brings two claims in its Complaint: 1) breach of contract against PVPGC and 2) action on bond against USSC and HCC Surety Group. USSC and HCC Surety Group move for summary judgment in their favor arguing that the Borough failed to satisfy the express conditions precedent set forth in the EB Bond and the GCC, and that the Borough committed an Owner Default. PVPGC counterclaims against the Borough alleging that the Borough breached its contract for the general construction work on the Project and violated the Pennsylvania Prompt Payment Act, 62 PA. CONS. STAT. ANN. § 3901, et seq. PVPGC now moves for partial summary judgment in its favor for its breach of contract counterclaim.

**STANDARD OF REVIEW**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "genuine" issue exists where there is a "sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party." Byrne v. Chester Cnty. Hosp., No. 09-889, 2012 WL 4108886, at *2 (E.D. Pa. Sept. 19, 2012) (citing Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)). "A factual dispute is 'material' if it might affect the outcome of the case under governing law." Id. All factual doubts should be resolved and all reasonable inferences drawn in favor of the nonmoving party. Torretti v. Main Line Hosp., Inc., 580 F.3d 168, 172 (3d Cir. 2009) (citing DL Res., Inc. v. FirstEnergy Solutions Corp., 506 F.3d 209, 216 (3d Cir. 2007)). "The inquiry performed is the threshold inquiry of determining whether

there is the need for a trial-whether, in other words, there are any genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be resolved in

favor of either party." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007)

(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). "[U]nsupported assertions,

conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary

judgment." Byrne, 2012 WL 4108886, at *2. The movant is responsible for "informing the court

of the basis for its motion for summary judgment and identifying those portions of the record that

it believes demonstrate the absence of a genuine issue of material fact." Id. (citing Celotex Corp.

v. Catrett, 477 U.S. 317, 323 (1986)).

## DISCUSSION

The Court will commence its discussion analyzing PVPGC's breach of contract

counterclaim against the Borough, and then turn to the Sureties' summary judgment motion

against the Borough's action on bond claim.

**I. PVPGC's Breach of Contract Counterclaim against the Borough**

PVPGC argues that the Borough breached its contractual agreement with PVPGC

because the Borough 1) failed to satisfy the express requirements of the EB Bond and the GCC

when terminating PVPGC; 2) violated its duty to coordinate the other prime contractors for the

Project; and 3) misled PVPGC about the Borough's funding sources for the Project at the start of

their contractual relationship. Because the Court finds that there is no genuine dispute as to any

material fact with respect to the Borough's failure to satisfy the provisions of the GCC when

terminating PVPGC, the Court grants summary judgment in PVPGC's favor, and need not

address PVPGC's second and third arguments in support of its Motion for Partial Summary

Judgment.

### A. Termination of PVPGC

PVPGC counterclaims against the Borough for breach of contract because the Borough allegedly failed to satisfy the requirements of the EB Bond and the GCC when terminating PVPGCC. "Under Pennsylvania law, notice to terminate a contract must be 'clear and unambiguous.'" LBL Skysystems (USA), Inc. v. APG-Amearica, Inc., No. 02-5379, 2005 WL 2140240, at *28 (E.D. Pa. Aug. 31, 2005) (quoting E. Milk Producers Co-op. Ass'n v. Lehigh Valley Co-op. Farmers, 568 F. Supp. 1205, 1207 (E.D. Pa. 1983)); see also Mextel v. Air-Shields, Inc., No. 01-7308, 2004 U.S. Dist. LEXIS 1281, at *61 (E.D. Pa. 2005) (quoting Maloney v. Madrid Motor Corp., 122 A.2d 694, 696 (Pa. 1956)). Where the conduct and language of the party intending to terminate the contract is ambiguous, he will be deemed as not having terminated the contract. See Mextel, 2004 U.S. Dist. LEXIS 1281, at *61 (citing Maloney, 122 A.2d at 696). "Conditions precedent to a contract termination must be strictly fulfilled." See id. at *60 (quoting Accu-Weather, Inc. v. Prospect Commc'ns, Inc., 644 A.2d 1251, 1254 (Pa. Super. Ct. 1994)). "Providing a cure notice of curable breaches deemed by the nonbreaching party to be sufficiently material to warrant termination for cause is a fundamental prerequisite to termination." 5 Bruner & O'Connor on Construction Law § 18:15.

PVPGC's Motion for Partial Summary Judgment asserts that the Borough inadequately terminated PVPGC, violating the terms of both the EB Bond and the GCC and, therefore, breached its contract with PVPGC. The Court clarifies that a contract of suretyship exists solely "between the principal and the surety." Bd. of Trs., Roofers Local No. 30 Combined Welfare Fund v. Int'l Fid. Ins. Co., No. 10-4721, 2014 WL 534762, at *6 (E.D. Pa. Oct. 21, 2014) (citing cases). A contract of suretyship "represents a three-party association where a creditor is entitled to performance of a contractual duty by the principal debtor or alternatively, if the debtor

defaults, by the debtor's surety." <u>Reliance Ins. Co. v. Penn Paving, Inc.</u>, 734 A.2d 833, 836 (Pa. 1999) (quoting <u>Gen. Equip. Mfrs. v. Westfield Ins. Co.</u>, 635 A.2d 173, 180 (Pa. Super. 1993)).

In this case, the EB Bond named PVPGC as the Contractor/Principal, USSC as the Surety, and the Borough as the Owner. Therefore, the EB Bond created a contractual relationship between only PVPGC and USSC. Of course, if PVPGC defaulted, the Borough was entitled to request USSC's performance, which the Borough attempted to do. Any failure on the part of the Borough to satisfy its duties pursuant to the terms of the EB Bond, however, had no bearing on its performance under the GCC. Consequently, PVPGC's counterclaim against the Borough for breach of contract is limited to the Borough's performance under the GCC. Thus, the Court will focus its analysis on the termination provisions of the GCC.

Article 28 of the General Conditions of the GCC described the process for annulment, requiring that before terminating the GCC, the Borough provide **both** PVPGC and USSC with written notice of PVPGC's "delay, neglect or default," after which time, PVPGC had three days to cure. (<u>See</u> USSC/HCC's Mot. for Summ. J. Ex. T, Art. 28; <u>see also</u> Borough's Br. in Opp'n Ex. C, at CEA1819, Doc. 51.) Additionally, Paragraph 3 of the GCC reiterated PVPGC's right to written notice and a three-day cure period prior to termination. (<u>See</u> Borough's Br. in Opp'n Ex. C, at CEA1785, Doc. 51.)

On June, 28, 2012, the Borough granted PVPGC a 19-day extension for completing the Project until July 19, 2012. (<u>See id.</u> at Ex. M.) However, PVPGC failed to meet that deadline. Accordingly, the Borough claims that PVPGC failed to "prosecute the work with promptness and diligence" in compliance with Paragraph 3 of the GCC, thus justifying the Borough's termination of PVPGC. (Borough's Br. in Opp'n Ex. C, at CEA1785, Doc. 51.)

CEA's Project Manager, Louis D. Brown, sent a letter to Mr. Pirozzi on July 20, 2012 stating:

> Please be advised the Time for Completion has expired as of July 20, 2012, as based on a letter dated June 28, 2012. Despite several attempts, we still have not received a revised schedule for completion.
> Be advised that Borough Council reserves their rights of [sic] under the General Conditions of the contract, including but not limited to Article 26, Article 28 and Article 40.

(USSC/HCC's Mot. for Summ. J. Ex. W; Borough's Br. in Opp'n Ex. O, Doc. 51.)

The Borough claims that Mr. Brown's July 20, 2012 letter to Mr. Pirozzi adequately terminated PVPGC. (See Borough's Br. in Opp'n 9, 11, Doc. 51.) The Court disagrees. Mr. Brown's letter did not provide sufficiently "clear and unambiguous" notice to terminate a contract. See, e.g., LBL Skysystems, 2005 WL 2140240, at *28; E. Milk Producers, 568 F. Supp. at 1207; Mextel, 2004 U.S. Dist. LEXIS 1281 at *61. The letter simply notified Mr. Pirozzi that PVPGC's 19-day extension had passed and the time to complete its work on the Project had expired. Furthermore, Mr. Brown, the author of the July 20, 2012 letter, testified that his letter was, in fact, not a termination letter. (See Brown Dep. 292:7-20, 293:2-6.) Indeed, in his deposition, Mr. Brown explained that his letter spelled out for PVPGC that the 19-day day extension had expired. (See Brown Dep. 292:7-20.) Additionally, Mr. Brown did not copy anyone from USSC on his July 20, 2012 letter, as was required by Article 28 of the GCC. Moreover, the contents of Mr. Brown's letter were insufficient to constitute a proper termination notice. Mr. Brown did not identify the Borough's many grievances with respect to PVPGC's performance, which the Borough considered sufficiently material to warrant PVPGC's termination. See 5 Bruner & O'Connor on Construction Law § 18:15. As such, Mr. Brown did not give PVPGC adequate notice to cure. As a result, the Court concludes that the July 20, 2012 letter does not constitute a proper termination letter under the provisions of the GCC.

14

In the alternative, the Borough argues that PVPGC understood that it had been terminated by Mr. Catania's July 24, 2012 letter to USSC. (See Borough's Br. in Opp'n 12, Doc. 51.) That letter indicated "that Eddystone Borough is **exercising its rights under the agreement to terminate** the contract with Peter V. Pirozzi Contracting, LLC." (See id. at Ex. Q (emphasis added).) While Mr. Catania's July 24, 2012 letter uses clear language to terminate the Borough's contract with PVPGC, it is still deficient as a termination letter because Mr. Catania did not send a copy to PVPGC as required by Article 28 and Paragraph 3 of the GCC.

The Court concludes that the Borough breached the terms of its construction contract with PVPGC by failing to give adequate written notice of PVPGC's termination pursuant to Article 28 and Paragraph 3 of the GCC. No reasonable jury could find otherwise. The Court grants partial summary judgment in favor of PVPGC on PVPGC's breach of contract counterclaim.

## II The Borough's Action on Bond Against USSC and HCC Surety Group

The Borough brings an action on bond against the Sureties while the Sureties argue that their obligations under the EB Bond were discharged because the Borough did not satisfy the EB Bond's express requirements. The Sureties also contend that the Borough failed to provide adequate written notice of PVPGC's termination thereby constituting an Owner Default and failing to satisfy a condition precedent under the EB Bond and the GCC.

### A. Owner Default

The Sureties allege that the Borough committed an Owner Default, which is defined at Paragraph 12.4 of the EB Bond as: "Failure of the Owner, which has neither been remedied nor waived, to pay the CONTRACTOR as required by the Contract **or to perform and complete or comply with the other terms thereof**." (USSC/HCC's Mot. for Summ. J. Ex. G ¶ 12.4

(emphasis added).) The Sureties argue that the Borough's failure to formally and adequately terminate PVPGC pursuant to the terms of the GCC violated both Paragraph 3.2 of the EB Bond and Article 28 of the GCC.

Paragraph 3.2 of the EB Bond required the Borough to formally terminate "the CONTRACTOR's right to complete the CONTRACT." (Id. at Ex. G ¶ 3.2.) The Court granted PVPGC's Motion for Partial Summary Judgment above, concluding that the Borough breached the termination provisions of its general construction contract with PVPGC. Accordingly, the Court agrees with the Sureties that the Borough's failure to comply with the termination provisions of the GCC constituted an Owner Default pursuant to Paragraph 12.4 of the EB Bond, thus discharging the Sureties.

Still, the Court will continue its discussion of PVPGC's compliance with the requirements of the EB Bond to determine whether PVPGC adequately triggered USSC's obligations under the EB Bond.

## B. Express Requirements of the EB Bond

The Sureties argue that Paragraph 3 of the EB Bond established conditions precedent, which the Borough was required to fulfill to properly declare PVPGC in default and to advance a performance bond claim, if the Borough was not in default. The Sureties further assert that the Borough failed to fulfill those conditions precedent, and therefore, the Borough is barred from holding the Sureties liable. The Borough disagrees that the terms of Paragraph 3 create conditions precedent, and instead, contends that Paragraph 3 should be interpreted as a promise or covenant.

1. *Paragraph 3 of the EB Bond Creates Conditions Precedent to the Surety's Obligations*

A condition precedent is an act or event which must occur before a duty to perform under a contract arises. N. Am. Specialty Ins. Co. v. Chichester Sch. Dist., No. 99-2394, 2000 WL 1052055, at *15 (E.D. Pa. July 20, 2000). In Pennsylvania, a condition precedent to an obligation must be expressed using clear language "or it will be construed as a promise or covenant." Mellon Bank N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1016 (3d Cir. 1980). To create a condition precedent, no particular words need to be utilized, but "[l]anguage not clearly written as a condition precedent is presumed not to be, unless the contrary clearly appears to be the intention of the parties." Chichester, 2000 WL 1052055, at *15 (citing Acme Markets, Inc. v. Fed. Armored Exp. Inc., 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994)). "Under Pennsylvania law, the party alleging the breach of a condition precedent bears the burden of proving both the existence of such a condition and the breach of the condition." Id. (citing Mellon Bank, 619 F.2d at 1007-08).

The language in Paragraph 3 of the EB Bond clearly establishes conditions precedent prompting USSC's obligations. Paragraph 3 of the EB Bond begins: "If there is no OWNER [Borough] Default, the Surety's obligation, under this Bond shall arise **after** . . . ." (USSC/HCC's Mot. for Summ. J. Ex. G (emphasis added).) The EB Bond then sets forth the process required to trigger these obligations. Paragraph 4 of the EB Bond continues: "**When the OWNER has satisfied the conditions of paragraph 3**, the Surety shall promptly and at the Surety's expense take one of the following actions . . . ." (Id. (emphasis added).) Thus, USSC's duty to perform depends on the Borough's completion of the steps outlined in Paragraph 3.

Additionally, the language in the EB Bond is almost identical to that in other performance bonds such as the A312 Bond and the EJCDC Bond. This Court and several others

17

have recognized this same language, found also in Paragraph 3 of the A312 Bond and the

EJCDC Bond, as establishing conditions precedent to the surety's obligations. See, e.g.,

Chichester, 2000 WL 1052055, at *16 ("Reading the Performance Bond at issue . . . it appears

that the provisions of paragraph 3 are, in fact, conditions precedent to the duty of the surety . . .

."); Mid-State Sur. Corp. v. Thrasher Eng'g, Inc., 575 F. Supp. 2d 731, 741 (S.D.W. Va. 2008)

("The plain language of paragraph 3 of the Performance Bond provides for conditions precedent

to [the Surety's] liability under the Bond."); Enter. Capital, Inc. v. San-Gra Corp., 284 F. Supp.

2d 166, 179-81 (D. Mass. 2003) (same); 120 Greenwich Dev. Assocs., LLC v. Reliance Ins. Co.,

No. 01-8219, 2004 WL 1277998, at *12 (S.D.N.Y. June 8, 2004) ("Paragraph 3 of the Bond . . . .

creates unambiguous preconditions for triggering [the Surety's] obligations under the Bond . . .

.").

   To challenge the Surety's contention that the provisions in Paragraph 3 establish

conditions precedent, the Borough erroneously relies on one case from the Southern District of

New York, International Fidelity Insurance Company v. County of Rockland. 98 F. Supp. 2d

400, 433 (S.D.N.Y. 2000). The Borough fails to recognize that the Owner's claim in Rockland

related to indemnification for delay damages, which differs from the Borough's claims in this

case. Here, the Borough sought to have USSC take affirmative steps consistent with Paragraph 4

of the EB Bond, which would have required USSC to undertake performance of the GCC,

arrange for completion, obtain another contractor, or immediately pay the Borough to complete

the Project. (See USSC/HCC's Mot. for Summ. J. Ex. G ¶ 4.) In fact, the court in Rockland

acknowledged, "There may be reasons, relating to both the overall wording of the contract and

the practicalities of construction projects, why the ¶ 3 steps might generally constitute conditions

precedent to enforcement of the affirmative ¶ 4 obligations . . . ." <u>Id.</u> The claims in this case are distinct from those in <u>Rockland</u>.

The Court concludes that the provisions in Paragraph 3 of the EB Bond created conditions precedent to USSC's obligations under the EB Bond. The Court next turns to whether the Borough satisfied these conditions.

    *2. Paragraph 3.1 – Notice and Conference*

USSC asserts that the Borough failed to satisfy the requirements under Paragraph 3.1 of the EB Bond, which required the Borough to 1) notify both PVPGC and USSC that it was considering declaring PVPGC in default, and 2) request and attempt to arrange a conference with PVPGC and USSC within 15 days of receipt of such notice. (<u>See</u> USSC/HCC's Mot. for Summ. J. Ex. G ¶ 3.1.) The Borough counters that it substantially complied with the pre-default notification terms of the EB Bond.

"[T]he 'considering declaring' provision of the Bond functions to initiate a conflict-resolution process that could potentially obviate a declaration of default." <u>Donald M. Durkin Contracting, Inc. v. City of Newark</u>, No. 04-163, 2006 WL 2724882, at *8 (D. Del. Sept. 22, 2006) (commenting on a performance bond with language identical to that in Paragraphs 3.1 and 3.2 of the EB Bond). Serious consequences follow a "declaration of default," and thus, "it is vital that the declaration be made in terms sufficiently clear, direct, and unequivocal to inform the surety that the principal has defaulted on its obligations and the surety must immediately commence performing under the terms of its bond." <u>L & A Contracting Co. v. Southern Concrete Serv., Inc.</u>, 17 F.3d 106, 110-11 (5th Cir. 1994).

"The doctrine of substantial performance is intended to benefit 'those who have faithfully and honestly endeavored to perform their contracts in all material and substantial particulars, so

19

that their right to compensation may not be forfeited by reason of mere technical, inadvertent or unimportant omissions or defects.'" In re Stein, 57 B.R. 1016, 1021 (E.D. Pa. 1986) (quoting First Mortg. Co. of Pa. v. Carter, 452 A.2d 835, 837 (Pa. Super. 1982)). "However, the doctrine of substantial performance cannot be invoked by one who has willfully, carelessly, or in bad faith failed to perform." First Capital Corp. v. Country Fruit, Inc., 19 F. Supp. 2d 397, 400 (E.D. Pa. 1998) (citing W. Dev. Grp., Ltd. v. Horizon Fin., 592 A.2d 72, 76 (Pa. Super. 1991)). Still, "absent a willful omission, a question of substantial performance is one for the jury, not the court." Id. (citing Horizon Fin., 592 A.2d at 77)).

Importantly, conditions in a contract can be express or implied. Express conditions arise when parties agree to impose said conditions on themselves while implied or constructive conditions are imposed by law. See 13 Lord, Williston on Contracts § 38:12 (4th ed. 2010) ("[A]n express condition . . . depends for its validity on the manifested intention of the parties . . . . When, however, the law has imposed the condition, that is, when the condition is constructive and arises absent any intention manifested by the parties or irrespective of their manifested intention. . . .); In re NextMedia Grp., Inc., 440 B.R. 76, 80 (D. Del. 2010) (citing Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685 (1995)); Diamon v. Penn Mut. Fire Ins. Co., 372 A.2d 1218, n.9 (Pa. Super. 1977) ("An express condition is provided for by the parties." (quotations omitted)). "Express conditions must be literally performed," but constructive conditions "are subject to the precept that substantial compliance with the condition . . . is sufficient." 13 Lord, Williston on Contracts § 38:12.

The Court found above that the provisions of Paragraph 3 of the EB Bond created conditions precedent that needed to be satisfied before USSC's obligations under Paragraph 4 of the EB Bond arose. The parties' intent in creating express conditions is clear. Accordingly, the

Court refuses to apply the doctrine of substantial performance to the facts of this case. See, e.g., id.; Oppenheimer & Co., 86 N.Y.2d at 692 (refusing to apply the concept of substantial compliance where the parties made an event a condition of their agreement, creating an express condition precedent to performance; "Substantial performance in this context is not sufficient.").

USSC argues that the Borough failed to properly notify PVPGC and USSC that it was considering a Contractor default. To properly give notice that it was considering declaring PVPGC in default, the Borough needed to send notice to the addresses described in Paragraph 10 of the EB Bond. (See USSC/HCC's Mot. for Summ. J. Ex. G ¶ 10.) Paragraph 10 indicates that the correct address to give notice is the one shown on the signature page of the EB Bond, which listed only one address: 20 W. Aylesbury Road, PO Box 5605, Timonium, MD 21094-5605. (Id. at Ex. G.)

Here, the Borough failed to 1) inform PVPGC and USSC that it was considering declaring default, and 2) send notice to the correct address indicated on the signature page of the EB Bond. On July 17, 2012, Mr. Brown, on behalf of the Borough, sent an e-mail to Gemma B. Fendler who had previously signed the EB Bond as USSC's attorney-in-fact. (See id. at Ex. CC.) Mr. Brown's e-mail simply requested that Ms. Fendler "or someone from the bonding company attend the remaining progress meetings for the Firehouse construction," which were held on Tuesday mornings at 8:30. (Id.)

Mr. Brown's e-mail was defective as a pre-default notification for several reasons. Firstly, the content of the e-mail is inadequate to constitute a pre-default notification. Nowhere in the e-mail does Mr. Brown indicate that the Borough considered declaring default or, in fact, declared PVPGC in default. Secondly, Mr. Brown did not copy anyone from PVPGC as was

required by Paragraph 3.1 of the EB Bond. Thirdly, Mr. Brown did not send a copy of his e-mail to the address in Timonium, Maryland, as directed by Paragraphs 3 and 10 of the EB Bond. Finally, Ms. Fendler did not work for USSC, but for Moten Associates, a distinct entity. Mr. Brown's e-mail demonstrates that he was aware that Moten Associates was distinct from USSC when he wrote, "you **or** someone from the bonding company." (Id.) Additionally, at the time that Mr. Brown sent his e-mail, Ms. Fendler no longer worked at Moten Associates. (Fendler Dep. 12:7-22.)

In its defense, the Borough unavailingly argues, "As far as Catania and the Borough knew, Gemma Fendler was both Attorney-In-Fact and an apparent agent of USSC, HCC, and her client Pirozzi." (Borough's Br. in Opp'n 11, Doc. 48.) The Borough relies on Ms. Fendler's signature on the EB Bond to justify its having sent the July 17, 2012 e-mail to Ms. Fendler instead of someone at USSC. Notwithstanding the fact that the contents of the e-mail hardly constituted a pre-default notice, the Borough still failed to satisfy the requirements in Paragraph 3.1 of the EB Bond for the other reasons set forth above. Moreover, months earlier, USSC notified the Borough regarding the correct individual at USSC with whom the Borough should correspond when referring to the Surety's obligations under the EB Bond. A USSC senior claim attorney, Emily A. Brennan had sent Mr. Brown a letter by facsimile and postal mail on November 18, 2011, stating: "You may direct all future correspondence relating to this matter to my attention at the address listed on this letterhead or via email to ebrennan@hccsurety.com." (USSC/HCC's Mot. for Summ. J. Ex. R.) The address listed on the letterhead was the same Timonium, Maryland address listed on the signature page of the EB Bond. The Borough's attempt to skirt its responsibility under Paragraph 3.1 of the EB Bond is flagrantly apparent to the Court.

In a second attempt to demonstrate that it "substantially complied" with Paragraph 3.1's pre-default notice requirement, the Borough references a July 24, 2012 letter that Mr. Catania sent to USSC and HCC. (See Borough's Br. in Opp'n 14, Doc. 48; id. at Ex. Q.) Mr. Catania sent this letter directly to Ms. Fendler and to the attention of Andrea Engler, a bonds claims assistant with the Sureties. Mr. Catania successfully mailed this letter to the correct address for USSC in Timonium, Maryland and copied Sandy Liberatori, Esq., John Pappas, and Vincent Giorgio to this letter. Ms. Liberatori worked for the Borough; Mr. Pappas was the Borough Council President; and Mr. Giorgio began working at Moten Associates in July 2012.

However, the Borough's contentions that Mr. Catania's July 24, 2012 letter constituted adequate pre-default notice pursuant to Paragraph 3.1 of the EB Bond fail for multiple reasons. Firstly, Mr. Catania did not send a copy of his letter to PVPGC, thereby failing to satisfy the requirements of Paragraph 3.1 that notice also be sent to the Contractor. Secondly, Mr. Catania's letter states, in relevant part: "Please be advised that **Eddystone Borough is exercising its rights under the agreement to terminate the contract with Peter V. Pirozzi Contracting, LLC**. It is the Borough's intent to contract with reputable contractors to finish the project." (Id. at Ex. Q (emphasis added); USSC/HCC Informative Mot. Ex. X (emphasis added).) The letter did not indicate that the Borough was "considering declaring a Contractor default" nor was there an attempt to arrange a meeting, as Paragraph 3.1 of the EB Bond required.

The Borough attempts to construe the language in Mr. Catania's July 24, 2012 letter as nothing more than a pre-default notice and denies that Mr. Catania's letter was a termination letter. The Borough claims that this letter "stated that the Borough was exercising its **option** to terminate Pirozzi." (Borough's Br. in Opp'n at 14, Doc. 48 (emphasis added).) However, this is simply not true. Clearly, from the language in Mr. Catania's July 24, 2012 letter, the Borough

had terminated PVPGC. Mr. Catania did not state that there were any further deliberations on the part of the Borough. He did not indicate that he was notifying the parties to allow them "to discuss methods of performing the Contract" pursuant to Paragraph 3.1 of the EB Bond. (See USSC/HCC's Mot. for Summ. J. at Ex. G ¶ 3.1.) Rather, Mr. Catania unequivocally stated that the Borough was "exercising its rights . . . to terminate the contract" and signaled that the Borough would turn to other contractors to complete the Project.

Even more damaging to the Borough's argument here is Mr. Catania's own deposition testimony wherein he stated that he was instructed that if Mr. Pirozzi failed to sign and return a July 10, 2012 extension letter, PVPGC would be terminated. (See Catania Dep. 267:22-268:4, May 29, 2014.) Indeed, Mr. Pirozzi did not acknowledge the July 10, 2012 extension letter. And soon after PVPGC's first extension, which fell on July 19, 2012, Mr. Catania issued his July 24, 2012 letter terminating PVPGC.

Furthermore, in its Brief in Opposition to PVPGC's Motion for Partial Summary Judgment, the Borough characterized Mr. Brown's July 20, 2012 letter as a termination letter. (See Borough's Br. in Opp'n 9-11, Doc. 51.) Now, the Borough claims that PVPGC had not yet been terminated in July 2012 and instead, that Mr. Catania's July 24, 2012 letter was a pre-default notice. (See Borough's Br. in Opp'n. 14, Doc. 48.) The Borough repeatedly and disingenuously changes its position at every opportunity in an effort to elude its responsibilities. The record is clear and the Court concludes that the Borough failed to meet the pre-default notice requirements set forth in Paragraph 3.1 of the EB Bond.

In addition to its failure to fulfill the "considering declaring default" requirement, the Borough also failed to request and attempt to arrange a conference pursuant to Paragraph 3.1 of the EB Bond. Again, the Borough relies on Mr. Brown's July 17, 2012 e-mail to Ms. Fendler to

24

support its claim that it did attempt to convene a conference with the Surety and PVPGC. For the reasons discussed above, the Court finds that the Borough failed to properly satisfy the notice requirements to both USSC and PVPGC necessary to attempt to arrange a conference. Moreover, Mr. Brown's July 17, 2012 e-mail merely requested that Ms. Fendler attend the remaining scheduled progress meetings. (See USSC/HCC Mot. for Summ. J. Ex. CC.) The e-mail demonstrates no effort to arrange for a meeting between the Borough, PVPGC, and USSC for the purpose of "discuss[ing] methods of performing the Contract." (Id. at Ex. G ¶ 3.1.) The e-mail also did not set any specific date or time for such a meeting, but rather invited Ms. Fendler to all remaining meetings.

The Borough claims that Mr. Brown attempted to arrange a meeting in compliance with Paragraph 3.1 of the EB Bond when he verbally invited Vincent Giorgio from Moten Associates to attend a conference scheduled for July 31, 2012. (See Compl. ¶ 30.) According to Mr. Brown, he urged Mr. Giorgio to attend the meeting because the Borough was "going to execute and go after the bond to get the job finished . . . ." (Brown Dep. 303:8-304:1.) Assuming the veracity of the Borough's assertions here, the Borough still failed to satisfy Paragraph 3.1 requirements for the conference, as the Borough did not give PVPGC notice of this meeting.

For the reasons articulated above, the Court concludes that the Borough failed to satisfy the conditions precedent set forth in Paragraph 3.1 of the EB Bond necessary to trigger USSC's duties under Paragraph 4 of the EB Bond.

### C.  Annulment Pursuant to the GCC and EB Bond

The Borough's termination of PVPGC was deficient under both the GCC and the EB Bond. The Court concluded above that the Borough's termination of PVPGC was defective under Article 28 and Paragraph 3 of the GCC.

25

Paragraph 1 of the EB Bond incorporates by reference the GCC, and consequently, Article 28 of the GCC. (See USSC/HCC's Mot. for Summ. J. Ex. G ¶ 1.) Additionally, Paragraph 3.2 of the EB Bond required that the Borough **wait at least twenty days** after the Contractor and the Surety received notice pursuant to Paragraph 3.1 to declare a contractor default and **formally terminate** PVPGC's right to complete the GCC. (See id. at Ex. G ¶ 3.2.) As previously discussed, the Borough failed to satisfy the requirements of Paragraph 3.1. However, even if any of the purported pre-default notices that the Borough issued constituted proper notice under Paragraph 3.1, the Borough still fell short of the termination requirements under Paragraph 3.2 of the EB Bond. The two letters that the Borough claims satisfy Paragraph 3.1's notice requirements were issued on July 17, 2012 by Mr. Brown and July 24, 2012 by Mr. Catania. Neither of those letters fall at least twenty days prior to the Borough's actual termination of PVPGC. Additionally, the Borough did not formally terminate PVPGC. The Court concludes that the Borough's actions violated the termination requirements of the EB Bond.

### D.  Prejudice to the Sureties

The Borough avers that even if its notice was deficient, USSC was not harmed and, consequently, should not be allowed to avoid liability. USSC counters that the Borough's defective notice prejudiced USSC, as it was deprived the opportunity to mitigate damages.

A surety may be discharged of its obligations under the bond where there has been a breach of a condition precedent regardless of whether the surety suffered prejudice. See Wise Invs., Inc. v. Bracy Contracting, Inc., 232 F. Supp. 2d 390, 398 (E.D. Pa. 2002) (citing Brakeman v. Potomac Ins. Co., 371 A.2d 193, 195 (Pa. 1977)) (concluding that a surety was not excused from showing prejudice where the bond did not contain an express provision or condition

precedent); see also Sch. Bd. of Escambia Cnty., Fla. V. TIG Premier Ins. Co., 110 F. Supp. 2d 1351, 1353 (N.D. Fl. 2000) ("[F]ailure to adhere to a performance bond notification requirement is a material breach, resulting in the loss of an obligee's rights under the bond."). Absent an express provision creating a condition precedent, a surety must also show that it has been prejudiced to avoid liability. Wise Invs., 232 F. Supp. at 398.

The Court concluded above that Paragraph 3.1 of the EB Bond established conditions precedent to prompt USSC's obligations under the EB Bond, which the Borough failed to satisfy. Due to the Borough's breach of the terms of the EB Bond, the Sureties' duties under the EB Bond were discharged. Accordingly, the Court need not consider whether USSC suffered prejudice as a result of the Borough's breach.

## CONCLUSION

For the foregoing reasons, the Court concludes that the Borough breached its contract with PVPGC and failed to satisfy the requirements of the EB Bond to bring about the Sureties' obligations under the EB Bond. The Court grants summary judgment in favor of Peter V. Pirozzi General Contracting LLC, United States Surety Company, and HCC Surety Group, Inc.

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EDDYSTONE BOROUGH** : | |
| : | |
| **Plaintiff,** : | **Case No. 2:13-cv-01470-PBT** |
| : | |
| **v.** : | |
| : | |
| **PETER V. PIROZZI GENERAL** : | |
| **CONTRACTING, LLC,** : | |
| **and** : | |
| **UNITED STATES SURETY COMPANY** : | |
| **INC.,** : | |
| **and** : | |
| **HCC SURETY GROUP, INC.** : | |
| : | |
| **Defendants.** : | |
| : | |
| : | |
| **PETER V. PIROZZI GENERAL** : | |
| **CONTRACTING, LLC** : | |
| : | |
| **Third Party Plaintiff,** : | |
| : | |
| **v.** : | |
| : | |
| **CATANIA ENGINEERING** : | |
| **ASSOCIATES, INC.,** : | |
| : | |
| **Third Party Defendant.** : | |

<u>**ORDER**</u>

**AND NOW THIS** _____ day of April, 2015, upon consideration of Defendants United

States Surety Company ("USSC") and HCC Surety Group's Motion for Summary Judgment

(Doc. 44), Defendants USSC and HCC Surety Group's Informative Motion Regarding Docket

No. 44 (Doc. 45), Plaintiff Eddystone Borough's ("the Borough") Brief in Opposition to

Defendants USSC and HCC Surety Group's Motion for Summary Judgment (Doc. 48),

Defendants USSC and HCC Surety Group's Brief in Support of their Motion for Summary

28

Judgment (Doc. 53), Defendant/Counter-Plaintiff Peter V. Pirozzi General Contracting LLC's ("PVPGC") Motion for Partial Summary Judgment (Doc. 46), Plaintiff/Counter Defendant Borough's Brief in Opposition to PVPGC's Motion for Partial Summary Judgment (Doc. 51), Defendant/Counter-Plaintiff PVPGC's Reply Brief in Support of Its Motion For Partial Summary Judgment (Doc. 54), and all other briefs, exhibits, and papers herein, **IT IS HEREBY ORDERED and DECREED** as follows:

1. Defendant/Counter-Plaintiff PVPGC's Motion for Partial Summary Judgment against Plaintiff/Counter-Defendant Borough is **GRANTED**; and

2. Defendants USSC and HCC Surety Group, Inc.'s Motion for Summary Judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants USSC and HCC Surety Group, Inc. are **DISMISSED** from this action.

The remaining claims for this matter are as follows:

1. Plaintiff/Counter-Defendant Borough's breach of contract claim against Defendant/Counter-Plaintiff PVPGC;

2. Defendant/Counter-Plaintiff PVPGC's counterclaim for violations of the Pennsylvania Prompt Payment Act against Plaintiff/Counter-Defendant Borough; and

3. Defendant/Counter-Plaintiff/Third Party Plaintiff PVPGC's claims for negligent misrepresentation and tortious interference against Third Party Plaintiff Catania Engineering Associates, Inc.

**BY THE COURT:**

**/s/ Petrese B. Tucker**

_____

**Hon. Petrese B. Tucker, C.J.**

29